WOOD, Chief Judge.
During World War II, the U.S. Office of War Information warned the populace that “loose lips sink ships.” See The Phrase Finder, http://www.phrases.org.uk/ meanings/237250.html (last visited Sept. 15,2016). But what if the ships sailed some 70 years before the tongues wag? That is the problem we face in the present case, in which Elliot Carlson, along with a number of scholarly, journalistic; and historic organizations, seeks access to grand-jury materials sealed decades ago. The materials concern an investigation into the Chicago Tribune in 1942 for a story it published revealing that the ■ U.S. military had cracked Japanese codes. The government concedes that there are no interests favoring continued secrecy. It nonetheless resists turning over the. materials, on the sweeping ground that Rule 6(e) of the Federal Rules of Criminal Procedure entirely eliminates the district court’s common-law supervisory authority over the grand jury. It takes the position that no one (as far as we can tell) has the power to release these documents except for one of the reasons enumerated in Rule 6(e)(3)(E). If that is so, then Carlson and his allies must fail, because his request is outside the scope of Rule 6(e).
We find nothing in the text of Rule 6(e) (or the criminal rules as a whole) that supports the government’s exclusivity theory, and we find much to indicate that it is wrong. In fact, the Rules and their history imply the opposite, which is why every federal court to consider the issue has *756 adopted Carlson’s view that a district court’s limited inherent power to supervise a grand jury includes the power to unseal grand-jury materials when appropriate. Because the parties agree that this is an appropriate instance (if, in fact, the district court has this power) we affirm the order of the district court.
I
The story behind our case is a thrilling one, involving espionage, World War II, and legal wrangling. The year is 1942; the setting, the Pacific Theater. After Pearl Harbor was attacked in December 1941, the shocked U.S. Navy sprang into action. The Japanese military hoped to sink the remainder of the U.S. fleet and was aiming to do so in an attack on Midway Island and the Aleutian Islands, nearly 2,000 miles away, in June 1942. The Japanese planned to invade the Aleutians with a small detachment so as to lure U.S. ships out of their safe harbors, then attack those ships with a larger force while simultaneously invading and occupying Midway as the U.S. Navy was distracted. See NoRman Stone, WoRld War Two 123-24 (2012). Instead, the U.S. Navy forces pulled off a stunning victory, defending Midway and sinking all five carriers that the Japanese had devoted to the operation, as well as some other ships. The victory at Midway was widely seen as a turning point in the Pacific. Id. at 124.
How did the U.S. Navy know its plan would work? Unbeknownst to Japan, the United States had broken some critical Japanese codes some two years earlier. Anthony Beevor, The Seoond World War 307 (2012). The U.S. Navy was thus able-to figure out beforehand that Japan’s attack on the Aleutians was a feint, and Japan’s real goal was to overtake Midway and sink U.S. aircraft carriers in the process. Stone, supra, at 123. As the commander-in-chief of the U.S. Pacific Fleet explained in a later report, “[h]ad we lacked early information of the Japanese movement ... the Battle of Midway would have ended far differently.” Beevor, supra, at 311.
This explains why senior U.S. officials were so dismayed when the Chicago Tribune blew their secret. On June 7,1942, the Chicago Tribune’s, banner headline announced victory in the Battle of Midway. Right below, the Tribune dropped another bombshell: “Navy Had Word of Jap Plan to Strike at Sea.” Stanley Johnston, Chioa-go Tribune, June 7,1942, at Al. The article explained that the United States knew that Japan was planning a minor attack on one American base as a distraction from a major attack on another, and this advance notice enabled the Navy to plan its victorious counterattack. The article appeared to be — and as we now know, in fact was— based on a classified Navy communiqué that alerted naval commanders to the impending attack on Midway Island.
The article’s publication had immediate consequences: President Roosevelt and high-ranking military officials called for a criminal investigation. The Department of Justice complied, empaneling a grand jury and launching an investigation into whether the article’s author and other Tribune staff had violated the Espionage Act of 1917. The grand jury heard testimony from an assortment of witnesses, including Tribune personnel, several identified military officers, and three or four unknown officers. Ultimately, the grand jury did not issue any indictments, a decision that the Tribune and other prominent national newspapers hailed as a victory for free speech.
Fast forward to the present, more than 70 years later. Elliot Carlson is a journalist and historian with a special expertise in naval history. He is the author of Joe Rochefort’s War: The Odyssey of the Code *757 breaker Who Outwitted Yamamoto at Midway, an award-winning book on the commander who broke one of the Japanese codes. Carlson is currently writing a book on the Tribune’s Midway article and the ensuing investigation. Carlson and his co-plaintiffs (to whom we refer in the singular as “Carlson” for simplicity’s sake) .filed a petition in the Northern District of Illinois asking that court to unseal the transcripts of witness testimony before the Tribune grand jury.
Carlson chose the Northern District of Illinois because it was the court that originally had supervisory jurisdiction over the grand jury in question. He argued that this same court has continuing common-law authority over matters pertaining to that grand jury, including any application to unseal -grand-jury materials. The convening court, for instance, would have the authority to rule on disclosure pursuant to Federal Rule of Criminal Procedure 6(e). Carlson acknowledged that his request falls outside' the scope of the circumstances for releasing grand jury materials enumerated in the Rule. Nonetheless, relying on In re Craig, 131 F.3d 99 (2d Cir. 1997), Carlson argued that the district court has the inherent power to release grand-jury materials in situations not contemplated by Rule 6(e). He concedes that just as other inherent powers of the court should not be exercised lightly, see Dietz v. Bouldin, — US. —, 136 S.Ct. 1885, 1893, 195 L.Ed.2d 161 (2016); Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), this power too is tightly circumscribed. Craig identifies numerous factors that a court should weigh when exercising this limited inherent power.
Carlson argued that his request satisfied these criteria, and the district court agreed with him. It decided first that it possessed the inherent authority to unseal grande-jury materials in situations outside the scope of Rule 6(e)(3)(E). It considered each point identified by Craig and concluded that disclosure in this case was warranted. It thus ordered that the transcripts be released. The government, has appealed (and the order has been stayed pending appeal). The government agrees that if the district court has inherent authority to unseal grand-jury records, then “the transcripts have sufficient historical value to warrant release” under the Craig factors. It argues, however, fhat Rule 6(e) contains the exclusive list of reasons for which a district court may unseal grand-jury materials, and because historical value is not among them, the court was wrong to grant Carlson’s petition.
II
Before turning to the merits of the appeal, we must assure ourselves that both the district court and we have jurisdiction over this matter. Because neither Carlson nor any of his fellow petitioner-appellees were parties to the underlying grand jury investigation, we must confirm that at least-one of them has,standing to bring this claim. See Ezell v. City of Chicago, 651 F.3d 684, 696 n.7 (7th Cir. 2011) (“Where at least one plaintiff has standing, jurisdiction is seeuref,]” citing Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). And because Carlson does not invoke a Federal Rule of Criminal Procedure as the basis for granting his petition to obtain the records, relying instead on the court’s inherent power, we must confirm that we have subject-matter jurisdiction. We solicited supplemental briefs from the parties on these important points.
A
1
As a member of the public, Carlson has standing to assert his claim to the *758 grand-jury transcripts, because they are public records to which the public may seek access, even if that effort is ultimately unsuccessful (perhaps because of sealing, national security concerns, or other reasons). Article III of the Constitution limits the federal courts’ power to the adjudication of actual “Cases” and “Controversies!” U.S. Const. Art. III. The doctrine of standing has “developed ... to ensure that federal courts do not exceed” this authority. Spokeo, Inc. v. Robins, — U.S.--, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). To have standing, a plaintiff “must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.” Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). We review each element in turn.
Carlson’s injury-in-fact is the denial of access to government documents that he has a right to seek. A plaintiff suffers an injury-in-fact when she is unable to obtain information that is statutorily subject to public disclosure. Federal Elec. Comm’n v. Akins, 524 U.S. 11, 20-21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); Public Citizen v. Dep’t of Justice, 491 U.S. 440, 449, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). Injury-in-fact can arise from a comparable common-law source. See Spokeo, 136 S.Ct. at 1549; Id. at 1550-53 (Thomas, J., concurring) (explaining that plaintiffs asserting common-law injuries can more easily demonstrate injury-in-fact than others). Carlson needs only a “colorable claim” to a right to access these documents, because “[w]ere we to require more than a colorable claim, we would decide the merits of the case before satisfying ourselves of standing.” See Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 900 (7th Cir. 2012); see also Bond v. Utreras, 585 F.3d 1061, 1073 (7th Cir. 2009).
Thus the question becomes whether Carlson has a colorable claim of a right to obtain access to these documents. He does. Carlson argues that grand-jury records are court documents; he argues further that under the circumstances of this case he has a right to review them. Although the grand jury operates according to a “tradition of independence,” United States v. Williams, 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), “[t]he Constitution itself makes the grand jury part of the judicial process.” Cobbledick v. United States, 309 U.S. 323, 327, 60 S.Ct. 540, 84 L.Ed. 783 (1940); see also Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (“the powers of the grand jury are ... subject to the supervision of a judge”); Levine v. United States, 362 U.S. 610, 617, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (the grand jury is “an arm of the court”); Brown v. United States, 359 U.S. 41, 49, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959) (“[a] grand jury is clothed with great independence in many areas, but it remains an appendage of the court”) overruled on other grounds by Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); Blair v. United States, 250 U.S. 273, 278, 39 S.Ct. 468, 63 L.Ed. 979 (1919) (“the inquisitorial function of the grand jury ... [is] inci-dente to] the judicial power of the United States”).
 Because the grand jury is “part of the judicial process,” Cobbledick, 309 U.S. at 327, 60 S.Ct. 540, its “minutes and transcripts” are necessarily “records of the court.” United States v. Procter & Gamble Co., 356 U.S. 677, 684-685, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) (Whittaker, J., concurring); see also Standley v. Dep’t of Justice, 835 F.2d 216, 218 (9th Cir. 1987) (“grand jury materials are records of the district *759 court”); In re Grand Jury Investigation of Cuisinarts, Inc., 665 F.2d 24, 31 (2d Cir. 1981) (“Cuisinarts”) (same); United States v. Penrod, 609 F.2d 1092, 1097 (4th Cir. 1979) (same). And because they are records of the court, Carlson has a right to petition for access to them: the public has “a general right to inspect and copy public records and documents, including judicial records and documents.” Nixon v. Warner Commc’ns, Inc., 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The denial at the threshold of the right to petition for access inflicts an injury-in-fact on Carlson. See Akins, 524 U.S. at 20-21, 118 S.Ct. 1777; Public Citizen, 491 U.S. at 449, 109 S.Ct. 2558. That his petition is not guaranteed to be granted, because a court may find a valid justification for denying him access, in no way destroys his standing to seek the documents. See Nixon, 435 U.S. at 598-99, 98 S.Ct. 1306; United States v. Corbitt, 879 F.2d 224, 228 (7th Cir. 1989). To hold otherwise would amount to denying standing to everyone who cannot prevail qn the merits, an outcome that fundamentally misunderstands what standing is. See Booker-El, 668 F.3d at 900; Bond, 585 F.3d at 1073.
For public documents such as these, there is no need for Carlson to show that he has -any particular connection to the grand jury proceeding. As we explained in Jessup v. Luther, “[r]epresenta-tives of the press and general public must be given an opportunity to be heard on the question of ... access to documents.” 227 F.3d 993, 997 (7th Cir. 2000); see also Corbitt, 879 F.2d at 228-29 (entertaining newspaper’s request to see sealed pre-sen-tence report, and analogizing pre-sentence report to grand jury materials). To hold otherwise would raise First Amendment concerns. Cf. United States v. Edwards, 672 F.2d 1289, 1294 (7th Cir. 1982) (recognizing that the “common law right” of public access to- court records “supports and furthers many of the same interests which underlie those freedoms protected by the constitution”); Globe Newspaper Co. v. Sup. Ct. for Norfolk Cnty., 457 U.S. 596, 604, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (holding First Amendment guarantees access to criminal trials, and limitations on access are subject to strict scrutiny); Butterworth v. Smith, 494 U.S. 624, 630, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990) (reiterating, in the context of prohibiting a witness from discussing his testimony, “grand juries are expected, to operate within the limits of the First Amendment”). That Carlson is a member of the public is sufficient for him to assert his “general right to inspect and copy ... judicial records.” Nixon, 435 U.S. at 597, 98 S.Ct. 1306.
The administrative reality that the physical documents are currently housed in a facility operated by the National Archives and Records Administration (NARA), rather than in a storeroom controlled by the district court, does not change this analysis. NARA is an office of the executive branch; it manages archival documents “to ensure their continued preservation by the United States Government.” 44 U.S.C. § 2107(1). The Judiciary uses NARA to store old paper case files. See National Archives, www.archives.gov/ research/catalog/ (last visited Sept. 15, 2016) (search for court records). Rule 6(e)(1) explains that after the conclusion of a grand-jury investigation, the government’s attorneys will “retain control” of grand-jury materials, “[ujnless the court orders otherwise.” This indicates that the grand-jury materials are subject to the court’s control. The Committee Notes on Rule 6 further make this clear by explaining that the amendment was enacted to “accord with -present practice,” but that the Committee “specifically recognized ... that the court in a particular case may *760 have reason to order otherwise.” Fed, R. Ceim. P. 6(e), Committee Notes 1979, Even when grand-jury materials are in the custody of government attorneys, they “remain the records of the courts, and courts must decide whether they should be made public.” Cuisinarts, 655 F.2d at 31.
Carlson easily satisfies the other two elements of Article III standing.' His injury-in-fact is traceable to the respondent’s denial of access to the grand-jury materials. That injury would be rédressed by a court order granting him the relief he seeks — access to the transcript. Thus, Carlson has standing to seek access to grand jury materials.
Our decision in Bond v. Utreras is not to the contrary — indeed, it supports this position. 585 F.3d 1061 (7th Cir. 2009). In Bond, we drew a sharp line between civil pre-trial discovery documents that were never filed with the court and documents that were filed with the court. Id. at 1066. We held that “documents filed in court are presumptively open to the public” and explained- that this right of access “is derived from ... common-law,” codified by statute, and any “judicially imposed limitations on this right are subject to the First Amendment.” Id. at 1073-74 (emphasis added) (citing, inter alia, 28 U.S.C. § 452; Globe Newspaper Co., 457 U.S. at 603-06, 102 S.Ct. 2613). We emphasized that although a court may ultimately decide to shield certain documents from the public, the “general right of public access ... is enough to give members of the public standing” to seek them. Id. at 1074. In contrast, there is no statutory, rule-based, common-law, or constitutional right of the public to obtain discovery documents that are never filed with the court (and that is typically the status of the overwhelming majority of the- documents exchanged in civil discovery). A non-party thus has no right to intervene to seek
them. Id. at 1074-76 (citing SEC v. TheS-treet.com, 273 F.3d 222, 233 n.ll (2d Cir. 2001)).
The grand-jury transcripts that Carlson seeks are not like privately produced civil discovery that never makes it through the courthouse door. They are created under the authority of the grand jury, and they remain at all times under the power of the court. The Supreme Court has said that “[a]t the foundation of our federal government the inquisitorial function of the grand jury and the compulsion of witnesses were recognized as incidents of the judicial power of the United States.” Blair, 250 U.S. at 280, 39 S.Ct. 468. A grand jury cannot create any materials without the power of the court being used to empanel the grand jury and issue and enforce its subpoenas. Levine, 362 U.S. at 617, 80 S.Ct. 1038. Grand-jury transcripts are produced under “the supervision of’ the district court, Branzburg, 408 U.S. at 688, 92 S.Ct. 2646, and as a result they represent an exercise of the court’s power; they are “filed with the court,” Bond, 585 F.3d at 1073. They constitute a form of judicial papers.
Because grand-jury transcripts are, in them very nature, judicial documents (just as a transcript of a trial would be), there is no need for them to become part of the judicial proceeding through admission into evidence. Smith v. U.S. Dist. Court for S. Dist. of Ill., 956 F.2d 647, 650 (7th Cir. 1992) (judicial records to which there is a presumptive right of access include “transcripts of proceedings” and “items not admitted into evidence”). Thus, the presumptive right of access attaches and is sufficient to “give members of the public standing.” Bond, 585 F.3d at 1073-74. Carlson asserts a common-law right, and is therefore unlike the journalist in Bond who could point to “no constitutional or common-law right” to un-filed pre-trial *761 discovery materials. Id. at 1066. And we reiterate that the fact that a rule of criminal procedure or another compelling reason might lead to the denial of Carlson’s request in no way affects his standing.
2
Our conclusion that the records Carlson is seeking are court records makes it unnecessary for us to reach his alternative arguments: that they are agency records to which he-has a statutory right of access under the Freedom of Information Act, 6 U.S.C. § 652, or NARA’s enabling statute and implementing regulations, 44 U.S.C. § 2108(a)) or that he has an independent common-law right to petition the court for access to them, which gives him an independent basis for standing.
B
The next question is whether the district court was authorized to entertain this case. We are satisfied that it-was. The court had federal-question jurisdiction under 28 U.S.C. § 1331 because- this is an action “arising under the Constitution, laws,'or treaties of the United States.” Id. That Carlson is relying primarily on federal common law does not change this analysis. See Nat’l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S., 845, 850, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). Because the case raises a substantial question relating to the scqpe and meaning of Rule 6(e), federal-question jurisdiction is also proper under Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). See also Turner/Ozanne v. Hyman/Power, 111 F.3d 1312, 1316. (7th Cir. 1997). Resolving that question requires an examination of the relation between the Federal Rules of Criminal Procedure and a long-standing common-law right, thus necessarily raising a substantial federal question. Appellate jurisdiction is proper because the district court’s- order requiring disclosure finally resolves the only matter that was at issue. See 28 U.S.C. § 1291.
Ill
A
With the jurisdictional brush cleared away, we are ready to reach the merits. The institution of the grand jury reaches as far back as twelfth century England, when the common law itself was developing. See, e.g,, Mark Kadish, Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process, 24 Fla. St. U. L. Rev. 1 (1996); Alfredo Garcia, The Fifth Amendment: A Comprehensive and Historical Approach, 29 U. Tol. L. Rev. 209, 227-34 (1998). In the United States, it has been understood as “a constitutional fixture in its own right” that operates “in the courthouse and under judicial auspices.” Williams, 504 U.S. at 47, 112 S.Ct. 1735.
• The grand jury is not a free-floating institution, accountable to no- one. It is an “arm of the court,” and thus falls under the supervisory authority of the district- court. See Levine, 362 U.S. at 617, 80 S.Ct. 1038. It thus follows, as the Supreme Court confirmed both before and after the Criminal Rules were adopted, that the disclosure of sealed grand jury materials is “committed to the discretion of the trial judge.” Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959) (after the Rules were adopted); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (before). The question is how the Federal Rules of Criminal Procedure, and in particular Rule 6(e), affect this power.
*762 The inherent supervisory power of the court over the grand jury is well established. The “Constitution itself makes the grand jury a part of the judicial process.” Levine, 362 U.S. at 617, 80 S.Ct. 1038. For example, a grand jury may initiate prosecutions only “under general instructions from the court to which it is attached and to which, from time to time, it reports its findings.” Id.; see also 18 U.S.C. § 3331 (district court’s power to summon grand jury); Fed. R. Crim. P. 6(a) (same). And the grand jury may rely on the court’s authority to “compel a witness to appear” only because it is an “arm of the court.” Levine, 362 U.S. at 617, 80 S.Ct. 1038; see also 28 U.S.C. § 1826(a) (district court’s power to issue subpoena); Fed. R. CRiM. P. 17(a) (same); In re Grand Jury Proceedings, 507 F.2d 963, 965 n.2 (3d Cir. 1975) (discussing the same).
The matters over which the court exercises supervisory authority range from the mundane to the weighty. They include routine decisions regarding the daily operation of the grand jury when Rule 6 is ambiguous on a particular detail. For example, prior to 1979, Rule 6(d) stated that recording grand-jury proceedings was optional — “a stenographer or operator of a recording device may be present while the grand jury is in session” — but it did not specify who decided what to do. Every court to consider the issue said that this decision was left to the discretion of the trial court. See United States v. Price, 474 F.2d 1223, 1225 (9th Cir. 1973) (“recordation of grand jury proceedings should be routine and nonrecordation should be permissible only in exceptional circumstances”); United States v. Aloisio, 440 F.2d 705, 708 & n.2 (7th Cir. 1971); Schlinsky v. United States, 379 F.2d 735, 740 (1st Cir. 1967) (noting prosecutor’s practice of not recording and stating, “[w]hether, under our supervisory power ... we should now ... condemn [this practice] for the future, is not presented.”).
Given the grand jury’s role as an independent body, however, the district court’s supervisory power is “a very limited one.” Williams, 504 U.S. at 50, 112 S.Ct. 1735. It does not “permit judicial reshaping of the grand jury institution.” Rather, it may be used only to “preserve or enhance the traditional functioning” of the grand jury. Id, For example, a district court does not have the power to order a prosecutor to present exculpatory evidence to a grand jury. Such an order would be inappropriate - because, rather than “enhancing the traditional functioning” of a grand jury, it would “alter the grand jury’s historical role.” Id. at 50-51, 112 S.Ct. 1735.
Yet this limited inherent supervisory power has historically included the discretion to determine when otherwise secret grand-jury materials may be disclosed. Prior to the adoption of the Federal Rules of Criminal Procedure, the Supreme Court held that release of sealed grand jury materials “rests in the sound discretion of the [trial] court” and “disclosure is wholly proper where the ends of justice require it.” Socony-Vacuum Oil Co., 310 U.S. at 233-34, 60 S.Ct. 811.
The advent of the Criminal Rules did not eliminate a district court’s inherent supervisory power as a general matter. Rule 57(b) recognizes that the rules are not designed to be comprehensive; instead, it says, “when there is no controlling law ... [a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district.” Fed. R. Crim. P. 57(b). (This Rule has remained substantively the same since the original 1944 version.) To be sure, the court is powerless to contradict the Rules where they have spoken, just as the court cannot contradict a statute; Dietz, 136 S.Ct. at *763 1892; Carlisle v. United States, 517 U.S. 416, 420-21, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996); Bank of Nova Scotia v. United States, 487 U.S. 250, 255, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). But it is Rule 57(b), not Carlisle or Bank of Nova Scotia, that informs us what a court may do when the Rules are silent.
The Supreme Court has repeatedly stated that permissive rules do not “abrogate the power of the courts” to exercise their historic “inherent power” when doing so does not contradict a rule. Link v. Wabash R.R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (with respect to Fed. R. Civ. P. 41(b)). Just this year, it said so again. Dietz, 136 S.Ct. at 1891-92. A permissive rule — that is, a rule that permits a court to do something and does not include any limiting language — should not give rise to a negative inference that it abrogates the district court’s inherent power without a “clear[ ] expression of [that] purpose.” Link, 370 U.S. at 631-32, 82 S.Ct. 1386; G. Heileman Brewing Co. v. Joseph Oat Corp., 871 F.2d 648, 652 (7th Cir. 1989) (“mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition”).
This general principle applies to Rule 6, which has been construed not to eliminate the limited inherent supervisory authority the district courts have historically wielded over the administration of a grand jury. As the Supreme Court put it; Rule 6(e) is “but declaratory” of the long-standing “principle” that “disclosure” of grand jury materials is “committed to the discretion of the trial court.” Pittsburgh Plate Glass Co., 360 U.S. at 399, 79 S.Ct. 1237. Since then, the Court has “stressed that wide discretion must be afforded to district court judges in evaluating whether disclosure is appropriate.” United States v. John Doe, Inc. I, 481 U.S. 102, 116, 107 S.Ct. 1656, 95 L.Ed.2d 94 (1987); Pittsburgh Plate Glass Co., 360 U.S. at 400, 79 S.Ct. 1237 (“This Court has long held that there are occasions when the trial judge may in the exercise of his discretion order the minutes of a grand jury witness produced for use on his cross-exlamination at trial. Certainly disclosure is wholly proper where the ends of justice require it.” (internal citations and quotation marks omitted)); Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 223, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) (“[W]e emphasize that a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion.”); see also Procter & Gamble Co., 356 U.S. at 689, 78 S.Ct. 983. Thus, the existence of Rule 6 does not, by itself, eliminate the court’s power to address situations that the Rule does not describe.
B
The government urges, however, that there is a textual basis in the rule that supports its position. We therefore turn to a closer examination of the Rule’s language. Rule 6(e) is entitled “Recording and Disclosing the Proceedings [of the grand jury].” Subpart (1) requires that the proceedings be recorded. Subpart (2) is entitled “secrecy.” Rule 6(e)(2)(A) states that “no obligations of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B).” Rule 6(e)(2)(B) provides that “[u]nless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury....” The list identifies seven types of people who fall within that prohibition: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or a *764 person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii). Rule 6(e)(3), sets out some exceptions to the norm of nondisclosure. Subsection. (A), (B), and (C) of Rule 6(e)(3) describe when grand jury materials can be disclosed without the court’s permission — for instance, to other government attorneys or other grand juries — and contain limitations on the purposes for which that disclosed information can be used. Subsection (D) relates to foreign intelligence and similar materials; it is not involved here.
Subsection (E), that is, Rule 6(e)(3)(E), is the section- at- issue here: it describes disclosures that the court may authoi-ize. It states:
(E) The court may authorize disclosure — at a time; in a manner, and subject to any other conditions that it directs — of a grand jury matter
(i) preliminarily to or in connection with a judicial proceeding;
(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;"—
and at the request of (iii) a foreign government; (iv) tribal government; or (v). U.S. military, all for the purpose of enforcing then’ respective criminal laws. Fed, R. Crim. P. 6(e)(3)(E).
The government’s primary textual argument is that the phrase “[ujnless these rules provide otherwise,” which appears only in Rule 6(e)(2)(B), somehow carries over to all of Rule 6 and provides conclusive proof that the court’s power in sub-part (3)(E) is limited to the purposes listed under that heading. This makes no sense, either as-a reading of Rule 6(e) or as a general matter of statutory (or rule) construction. The government provides no explanation for why a limitation buried in subsection (B) of subpart (2) of Rule 6(e) secretly applies to the rule as a whole, or even worse (as it seems to be saying) to an entirely different subpart. We do not know of any principle of interpretation supporting this position, nor could the government provide us with any examples at oral argument.
It is far more reasonable to read Rule 6(e)(2)(B) as specifying, “unless these rules provide otherwise,” which persons are bound to keep grand-jury materials secret, and then to read Rule 6(e)(3)(E) as telling the court to whom it “may” authorize disclosure, without indicating anywhere that the list is exclusive. There' is nothing odd or counterintuitive in having one rule for disclosures that may not occur without court supervision, and a different rule for disclosures specifically ordered by the court.
Nor can we find language elsewhere in the rule supporting the government’s exclusivity theory. The government suggests that it is helped by Rule 6(e)(6), which states, “[rjecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure^]” This tells us that “disclosure of matters occurring before a grand jury is the exception and not the rule.” Fund for Constitutional Gov’t v. Nat’l Archives & Records Serv., 666 F.2d 866, 868 (D.C. Cir. 1981). But it says nothing about when disclosures are “unauthorized.”
The few hints that we find in the text of Rule 6(e) all indicate that the list in sub-part. (3)(E) is not exclusive. The presence of limiting language elsewhere in Rule 6(e), in (2)(B), indicates that its absence in (3)(E) is intentional. Fed. R. Crim. P. 6(e)(2)(B). A rule of nonexclusivity does not mean that Rule 6(e)(3)(E) is pointless: it would be entirely reasonable for the rulemakers to furnish a list that contains *765 frequently invoked reasons to disclose grand-jury materials, so that the court knows that no special hesitation is necessary in those circumstances. In addition, the permissive language of Rule 6(e)(3)(E) provides some support for Carlson’s position: it uses the word “may,” which “usually implies some degree of discretion.” United States v. Rodgers, 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). It also underscores that, when ordering disclosure pursuant to 6(e)(3)(E), the court has complete discretion over the manner of disclosure (“at a time, in a manner, and subject to any other condition it directs”). While this discretionary, language presumably refers to discretion within the confines of Rule 6(e)(3)(E), it provides some support for the general proposition that courts have discretion when unsealing records.
The history of the rules and the Committee Notes also support our reading of Rule 6(e)(3)(E). The Federal Rules of Criminal Procedure first appeared in 1944; the modern version of Rule 6(e) was enacted directly by Congress in 1977. See Pub. L. No. 96-78 § 2(a), 91 Stat. 319, 319 (1977); see generally In re Grand Jury Proceedings, Miller Brewing Co., 687 F.2d 1079, 1087 (7th Cir. 1982) (discussing history of the 1977 amendments) vacated in part on other grounds, 717 F.2d 1136 (7th Cir. 1983). Since that time, there have been stylistic revisions, but the substance of what is now Rule 6(e)(3)(E) is unchanged. The Committee Notes, to which we give some weight, see Schiavone v. Fortune, 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), also indicate that the Rule does not displace a court’s limited inherent power to address situations not contemplated by the Rules.
Rule 6 was first enacted to “continue[ ] the traditional practice of secrecy on the part of members of the grand jury, except when the court permits a disclosure.” Fed. R. Crim. P. 6, Committee Notes 1944. It has been updated in response to court practices, but one of those practices has been the recognition of .the district court’s wide discretion to address new situations as they arise. In the specific context of Rule 6(e)’s secrecy requirement, “as new exceptions outside of those enumerated in Rule 6(e) have gained traction among the courts, the scope of the rule has followed suit.” In re Kutler, 800 F.Supp.2d 42, 46 (D.D.C. 2011) (finding that special circumstances justified release of grand-jury records). The Supreme Court in Douglas Oil Co. of California acknowledged that the Rules Committee updated Rule 6 in response to courts’ “recognition of the occasional need for litigants to have access to grand jury materials.” 441 U.S. at 220, 99 S.Ct. 1667. To the same effect, the Southern District of New York observed that “exceptions to the secrecy rule generally have developed through conformance of Rule 6 to the ‘developments wrought in decisions of the federal courts,’ not vice versa.” In re Am. Historical Ass’n, 49 F.Supp.2d 274, 285 (S.D.N.Y. 1999) (quoting In re Hastings, 735 F.2d 1261, 1268 (11th Cir. 1984)).
The government also finds solace in the history of some unsuccessful efforts to change the rules, but this is notoriously unreliable evidence, even for those who are sympathetic to legislative history. And in any event, the Advisory Committee on Criminal Rules noted in the minutes of its meeting that it saw no need for the amendments because the courts had inherent power. We give this history no weight one way or the other.
Finally, we consider the decisions of our sister circuits. There, too, the government stands alone: no court has accepted its position. The Seeond, Eleventh, and D.C. Circuits have all considered the issue and *766 held that Rule 6(e)(3)(E) contains a permissive, not exhaustive, list of reasons for release of grand jury materials. See Craig, 131 F.3d at 101-03; In re Biaggi, 478 F.2d 489 (2d Cir. 1973); Hastings, 735 F.2d at 1268; Haldeman v. Sirica, 501 F.2d 714 (D.C. Cir. 1974) (en banc). And the government acknowledged at oral argument that no district court has bought its theory either. See, e.g., Am. Historical Ass’n, 49 F.Supp.2d at 285; In re Report & Recommendation of June 5, 1972 Grand Jury, 370 F.Supp. 1219, 1229 (D.D.C. 1974)
The Second Circuit’s reasoning in Craig is the most comprehensive. In Craig, a historian petitioned for the transcript of the grand jury investigation of Harry Dexter White, an Assistant Secretary of the Treasury accused hi 1948 of being, a communist spy. Craig, 131 F.3d at 101. The court held that a district court has the inherent power to disclose the materials in exceptional circumstances and noted that historic importance can be a sufficient reason when there is little countervailing need for secrecy. Id. at 105. It emphasized that this inherent power is “consonant with the role of the supervising court and will not unravel the foundations of secrecy upon which the grand jury is premised.” Id. at 103. Thus, given the great weight of authority against the government’s position, it “rejected] the government’s suggestion that [the court] unsettle this area of good law.” Id. This accords with the Eleventh Circuit’s comprehensive analysis in Hastings, and the D.C. Circuit’s briefer reasoning to the same effect in Haldeman. See Hastings, 735 F.2d at 1268; Haldeman, 501 F.2d at 715.
We have already gone so far as to say, in dicta, that “[w]e may not always be bound by a strict and literal interpretation of Rule 6(e) in the situation where there is some extraordinary and compelling need for disclosure in the interest of justice, and little traditional need for secrecy remains[.]” In re Special Feb., 1975 Grand Jury, 662 F.2d 1232, 1238 (7th Cir. 1981) aff'd on other grounds sub nom., United States v. Baggot, 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983); see also Corbitt, 879 F.2d at 239 (“it is clear that disclosure of grand jury materials in situations not governed by Rule 6(e) should be an uncommon occurrence.”); Miller Brewing Co., 687 F.2d at 1088 (district court “may not always be bound by a strict and literal interpretation of Rule 6(e)”). The Tenth Circuit has likewise acknowledged that “some relief may be proper under the court’s inherent authority” when there is a compelling need to unseal grand jury records for reasons not mentioned in Rule 6(e). In re Special Grand Jury 89-2, 450 F.3d 1159, 1178 (10th Cir. 2006).
The government argues that these opinions are no longer good law after Carlisle, 517 U.S. 416, 116 S.Ct. 1460, 134 L.Ed.2d 613, and Bank of Nova Scotia, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228. That point falls flat. The Second Circuit’s Craig decision post-dates both Carlisle and Bank of Nova Scotia, and the government cited them both to that court. And in any event, all that Carlisle and Bank of Nova Scotia say is that a court may not directly contradict a Rule. We have already explained why Carlson is asking for no such thing.
We are persuaded by the logic of Carlson’s arguments and the approach of our sister circuits, with whom we now join. The text and history of the Rules indicate that Rule 6(e)(3)(E) is permissive, not exclusive, and it does not eliminate the district court’s long-standing inherent supervisory authority to make decisions as needed to ensure the proper functioning of a grand jury. While this inherent supervisory authority is limited to “preserv[ing] or enhancing] the traditional functioning” of the grand jury, Williams, 504 U.S. at 50, *767 112 S.Ct. 1735, that includes the power to unseal grand jury materials in circumstances not addressed by Rule 6(e)(3)(E). See Pittsburgh Plate Glass Co., 360 U.S. at 399-400, 79 S.Ct. 1237.
IV
Given that the district court did have the power to exercise its discretion to determine whether to release the requested grand jury materials, the only remaining question is whether it abused that discretion. The government concedes that it did not, and we see nothing in this reeord that would justify a contrary finding, even had this point not been waived. The district court engaged in a thoughtful and comprehensive analysis of the pros and cons of disclosure before granting Carlson’s request, and we are content to let its analysis stand.
The district courts retain certain inherent powers, as the Supreme Court reaffirmed in Diets. One such power relates to their supervision of the disclosure of grand-jury materials. We join with our sister circuits’ in holding that Rule 6(e)(3)(E) does not displace that inherent power. It merely identifies a permissive list of situations where that power can be used, We therefore Affiem the order of the district court.