February 19, 2020

**Supreme Court**

No. 2017-301-Appeal.
(PM 17-701)

:

In re 38 Studios Grand Jury.            :

:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re 38 Studios Grand Jury.         :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  In this controversy, two constitutional officers of this state, the Governor and the Attorney General, present us with conflicting views about whether certain grand jury materials should become available to the public or whether, in the alternative, those materials should be protected from public view in accordance with existing court rules and centuries of cautious precedent.  The Governor and the Attorney General have both vigorously and articulately argued their positions as each sees her or his constitutional responsibilities.  In essence, the question presented to this Court is: Is the Superior Court vested with the "inherent supervisory authority" to order the public disclosure of grand jury materials—materials that are generally kept secret—from a grand jury that adjourned less than five years ago, that could potentially be reopened, and that dealt with events for which the potentially relevant statute of limitations has not yet run?  In her official capacity, Governor Gina M. Raimondo asks this Court to answer that question in the affirmative on appeal from a judgment of the Superior Court that answered the

- 1 -

question in the negative. For the reasons set forth in this opinion, this Court affirms the judgment of the Superior Court.

# I

## Facts and Travel

There can be no question that the Governor's appeal involves a matter of intense public concern with which many, if not most, Rhode Islanders are familiar. In 2010, the Economic Development Corporation (EDC), a quasi-public corporation created by the Rhode Island General Assembly, issued $75 million in bonds to guarantee loans for 38 Studios, a video game company headed by former Boston Red Sox World Series hero Curt Schilling. As is painfully well-known, just two years later 38 Studios failed and did not honor its obligation to repay the bonds, leaving the taxpayers of Rhode Island to foot an $88 million bill.[1]

In 2012, a statewide grand jury convened to investigate the possibility of potential criminality in connection with the 38 Studios deal. That grand jury sat for eighteen months and, as has been confirmed by the Attorney General, completed its work in 2015. During the course of the investigation, which began before the convening of the grand jury, approximately 146 individuals, including members of the 2010 General Assembly, were interviewed or called to testify before the grand jury. However, at the conclusion of the grand jury investigation, in a joint statement, the Attorney General and the Rhode Island State Police announced that there were not any "provable criminal violations of the Rhode Island General [L]aws in connection with the funding of 38 Studios, the disbursement of funds to 38 Studios, and by 38 Studios to vendors."

---

[1] As is explained later in this opinion, the state initiated litigation against a host of what it regarded as responsible parties and recovered over $61 million in settlements.

Independent of the grand jury investigation, the state initiated civil litigation against persons and entities that had been involved in the 38 Studios deal. The settlements recovered in excess of $61 million for taxpayers, and hundreds of thousands of documents produced during the course of litigation were made public. Following the close of the civil litigation, the Governor filed a miscellaneous petition in the Superior Court in February 2017, seeking "the release of all 38 Studios Grand Jury Records[.]"

To support her petition, the Governor argued: (1) that the Superior Court, in exceptional circumstances, has the discretion to release grand jury materials; (2) that exceptional circumstances exist; and (3) that the need for grand jury secrecy is outweighed by those exceptional circumstances. The Attorney General opposed the Governor's petition. The Presiding Justice of the Superior Court heard the petition in April 2017, and thereafter rendered a thorough twenty-four-page written decision in which she determined that, because the Governor was not seeking disclosure pursuant to Rule 6(e) of the Superior Court Rules of Criminal Procedure, which governs grand jury secrecy and permits disclosure of grand jury materials in certain enumerated instances, she was without authority to grant the Governor's petition. However, although she founded her ruling on the Rules of Criminal Procedure, the Presiding Justice also conducted alternative analyses and ruled that, even if the Superior Court had the authority to go beyond Rule 6(e) to allow disclosure of the grand jury materials requested, the grand jury materials in this case should not be disclosed because the Governor had failed to demonstrate a particularized need for the information requested and, separately, because policy factors that courts consider when

determining if grand jury disclosure is appropriate did not support disclosure in this case. Judgment therefore entered denying the petition, and the Governor timely appealed.[2]

Before this Court, the Governor asserts that it was error for the Presiding Justice to read Rule 6(e) as the sole avenue by which grand jury materials may be disclosed. She argues that, beyond the specific provisions of Rule 6(e), the Superior Court is cloaked with the "inherent authority" to disclose the material that she has requested. The Governor also contends that the Presiding Justice erred when she engaged in alternative analyses. In this regard, the Governor maintains that the Presiding Justice should not have applied the "particularized need" test to the petition for disclosure because that test applies only when evaluating a request for disclosure pursuant to Rule 6(e). Further, the Governor argues that the Presiding Justice abused her discretion when she determined, in the Governor's words, "that the Governor's disclosure request failed to meet factors in favor of the release of grand jury material."

## II

### Discussion

This case raises a weighty question of first impression in this jurisdiction. That is, whether the Superior Court has inherent authority to disclose grand jury materials beyond the parameters of the permitted disclosures that are set forth in Rule 6(e) of the Superior Court Rules of Criminal Procedure. This question is of grave importance because it concerns an institution that plays a critical role in our criminal justice system. Indeed, it often has been said that the grand jury "serves the dual function of determining if there is probable cause to believe that a crime has been

---

[2] We granted a motion by the American Civil Liberties Union of Rhode Island, Common Cause Rhode Island, The New England First Amendment Coalition, and the Rhode Island Press Association to file a brief as amicus curiae in support of the Governor's petition. We have found that brief to be thoughtful and scholarly, and we thank the amici for their participation.

committed and of protecting citizens against unfounded criminal prosecutions." *In re Doe*, 717 A.2d 1129, 1134 (R.I. 1998) (quoting *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 423 (1983)). Despite these important roles, however, it remains true that the function of the modern-day grand jury is not well known, even to many lawyers. *See* Paul S. Diamond, *Federal Grand Jury Practice & Procedure* § 1.01 at 1 (5th ed. 2012).

In Rhode Island, there exist both county and statewide grand juries. *See* G.L. 1956 chapters 11 and 11.1 of title 12. An individual in Rhode Island cannot be tried on any felony carrying a maximum penalty of life imprisonment without an indictment having been issued by a grand jury. R.I. Const., art. 1, § 7; Super. R. Crim. P. 7(a). Grand juries not only pass on whether to indict those charged or suspected of serious crimes, but they also serve an investigatory function. *See State v. Guido*, 698 A.2d 729, 735 (R.I. 1997) (discussing the grand jury's "interrelated but distinct functions" of investigation and indicting). A prosecutor who presents evidence and witnesses before the grand jury has the power to, "in practice, select the witnesses to be subpoenaed to appear before the grand jury and generally direct the investigation." *Id.* at 736 (quoting *In re Melvin*, 546 F.2d 1, 5 (1st Cir. 1976)). The prosecutor presents the evidence, and the relevant law, to the grand jury and may ultimately ask the grand jury to vote on an indictment. *See* Super. R. Crim. P. 6(f) ("An indictment may be found only upon the concurrence of twelve (12) or more jurors and shall be signed by each juror who concurred in the finding.").

In some cases, the prosecutor will have all of the information that he or she requires for an indictment readily available. Those types of cases would most commonly involve criminal offenses that require indictment by a grand jury, those that, as mentioned above, carry a maximum sentence of life imprisonment. That type of grand jury, which does not conduct an investigation but rather acts on a request to issue an indictment, is known as an "indicting grand jury." 1 Sara

Sun Beale, *Grand Jury Law and Practice* § 1:7 at 31 (2d ed. 2018). In other cases, however, the state may be uncertain as to whether proof of criminal conduct exists; in that situation, it will use the grand jury to compel witness testimony and receive evidence to determine whether provable criminal conduct has taken place. *See id.* at 32-33 (discussing the utility of the investigative grand jury and noting that it "is particularly well-suited to investigating business crime, political corruption, organized crime, and other criminal activity where there is no identifiable victim to report the offense and help investigative agencies"). When the government employs a grand jury in this way, it is commonly referred to as an "investigative grand jury." *Id.* at 31. Of course, after the completion of the investigation, if the government believes that there is sufficient evidence of provable criminal conduct, it will ask the grand jury to vote on whether to indict. If an indictment is returned, the case is charged and proceeds to trial or other disposition.

A grand jury that hears evidence, and that may be asked by the government to vote on indictments, is made up of between thirteen and twenty-three individuals who are selected at random from the general public. Sections 12-11.1-1 and 12-11.1-4; *see* G.L. 1956 § 9-9-1.1. Indeed, any person who is a citizen of the United States, resides in Rhode Island, is at least eighteen years of age, is able to understand and participate in the proceedings, and is capable of performing the duties of a juror is qualified to serve. Section 9-9-1.1. As such, the process is considerably democratic and affords targets of the grand jury the protection that accompanies review by their fellow citizens. However, and as previously discussed, the grand jury also affords the government considerable powers; if it suspects criminal activity, the government can hale witnesses and evidence before the grand jury in an inquisitorial fashion. *See Guido*, 698 A.2d at 735 ("[T]he grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary

- 6 -

rules governing the conduct of criminal trials." (quoting *United States v. Calandra*, 414 U.S. 338, 343 (1974))). Importantly, and unlike the more familiar petit jury of twelve, unanimity is not required of a grand jury. *See* Super. R. Crim. P. 6(f).

In order to better understand the "dual function" of the grand jury, and to better evaluate the Governor's request to release the 38 Studios grand jury material, we will provide an overview of the history of the institution.

## A

### A Brief History of the Grand Jury and the Modern Secrecy Rule

### English Roots

The history of the grand jury begins in England nearly a millennium ago during the twelfth century. King Henry II, in the enactment known as the Assize of Clarendon, established the initial form of the grand jury. Richard H. Helmholz, *The Early History of the Grand Jury and the Canon Law*, 50 U. Chi. L. Rev. 613, 613 (1983); Susan M. Schiappa, *Preserving the Autonomy and Function of the Grand Jury: United States v. Williams*, 43 Cath. U.L. Rev. 311, 324-25 (1993).[3] In its early form, the grand jury was made up of twelve men from each township who charged the accused in place of the victim. Schiappa, 43 Cath. U.L. Rev. at 325. Far from being a bastion against unfounded accusations, it has been said that: "The repressive nature of the medieval grand jury cannot reasonably be questioned." Diamond, *supra*, § 1.01 at 3. Indeed, the system as initially established was instituted as a means of increasing the power of the Crown, relative to the church and the nobility, and to raise money, because it was the King who received the resulting fines and

---

[3] Historically, an assize could refer to a number of things, including "[a] session of a court or council" or "[a] law enacted by such a body[.]" Black's Law Dictionary 150 (11th ed. 2019). Specifically, the Assize of Clarendon was "[a] decree issued in 1166 by Henry II to the justices in eyre and sheriffs concerning criminal procedure." *Id.* at 151.

forfeitures. Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 Fla. St. U.L. Rev. 1, 6 (1996); Schiappa, 43 Cath. U.L. Rev. at 326, 326 n.76. In fact, "[i]f the jurors failed to accuse a 'known' criminal, they were heavily fined." Diamond, *supra*, § 1.01 at 3.[4] Ominously, accusal by a grand jury was often followed by trial by ordeal; as such, "a grand jury's accusation was tantamount to a finding of guilt." *Id.*, § 1.01 at 4; *see* Kadish, 24 Fla. St. U.L. Rev. at 6-7; Schiappa, 43 Cath. U.L. Rev. at 325 n.71.[5]

By 1215, however, the incipient building blocks of due process were laid when King John signed the Magna Carta. Kadish, 24 Fla. St. U.L. Rev. at 7. Although the Magna Carta did not specifically refer to the grand jury, "[i]t did * * * introduce the concept of due process against which any procedural practice [of the day] must be measured." *Id.* Then, by the fourteenth century, during the reign of Edward III, the process of criminal prosecution in England morphed once again. *Id.* at 8. The role of the twelve men who, under the reign of King Henry II, would have made accusations that were essentially confirmed by trial by ordeal, was altered. *Id.* The accusatorial role was, instead, assumed by twenty-four knights who were selected by the county sheriff. *Id.* The twelve men previously responsible for accusations now functioned to return a verdict in cases of capital crime. *Id.* This body of twelve was called the petit jury. *Id.* Accusation in a grand jury followed by trial by petit jury is reflective of the course of criminal prosecution today. Nevertheless, that does not mean that, in those early days, criminal justice included the protections

---

[4] Professor Helmholz clarifies that, under the Assize, "sworn men of the inquest were asked not to accuse anyone * * * but to give voice to common fame[.]" Richard H. Helmholz, *The Early History of the Grand Jury and the Canon Law*, 50 U. Chi. L. Rev. 613, 616-17 (1983).

[5] In one odd rendition of trial by ordeal, an accused would be made to swallow a piece of bread or cheese whole. Susan M. Schiappa, *Preserving the Autonomy and Function of the Grand Jury: United States v. Williams*, 43 Cath. U.L. Rev. 311, 324 n.68 (1993). Only if the accused did not choke to death would he be found not guilty. *Id.* The extent of usage of this particular ordeal is unclear; however, the use of water to try the accused seems to have been the preferred method. *See id.* at 325 n.71; Helmholz, 50 U. Chi. L. Rev. at 617.

that we enjoy today. If the King was displeased, he could fine or imprison jury members who failed to convict—and he often did. *Id.* at 8-9.

It was "[n]ot until the 17th century * * * [that] the English grand jury earn[ed] its reputation as a body that not only accused the guilty, but also shielded the innocent from unfounded charges." Beale, *supra*, § 1:2 at 9. As early as 1642, Lord Coke, the famous English jurist, interpreted the Magna Carta as requiring "indictment or presentment of good and lawful men."[6] *Id.* Later, in 1681, two separate London grand juries, despite facing significant pressure from the Catholic-leaning King Charles II, declined to indict two of the King's Protestant enemies for treason. *See id.*, § 1:2 at 9-10; Diamond, *supra*, § 1.01 at 4; Schiappa, 43 Cath. U.L. Rev. at 327. Undaunted, the Crown empaneled a grand jury from a different county, resulting in the indictment of one of the King's Protestant targets, who was ultimately tried and executed. *See id.*, § 1:2 at 10; Diamond, *supra*, § 1.01 at 5-6. The other target fled into exile. *See id.*; Diamond, *supra*, § 1.01 at 5-6. Even in the face of these outcomes, "the London grand juries' refusal to indict in these cases was hailed as a demonstration that the grand jury was one of the chief safeguards of the liberty of Englishmen." *Id.*

**America**

The grand jury was used for instituting criminal charges in all the English colonies in America. Beale, *supra*, § 1:3 at 11. In Rhode Island, for example, a grand jury was first empaneled nearly four hundred years ago, in 1640.[7] *Id.*, § 1:3 at 12. Although it might be true that the grand

---

[6] Lord Coke famously wrote in 1604 that "the house of every one is to him as his * * * castle and fortress[.]" Semayne's Case (1604) 77 Eng. Rep. 194, 195; 5 Co. Rep. 91 a, 91 b. In addition, the phrase engraved above the bench of this Court: NON SUB HOMINE SED SUB DEO ET LEGE (meaning: Not under man but under God and Law), can also be traced back to Lord Coke, who, in 1607, attributed a variation of this phrase to Lord Bracton. Prohibitions Del Roy (1607) 77 Eng. Rep. 1342, 1343, 12 Co. Rep. 63, 65.

[7] This was a mere four years after Roger Williams founded Providence in 1636.

jury the colonists inherited from the mother country was "a governmental body by which the sovereign could enforce his will[,]" Diamond, *supra*, § 1.02 at 6, nonetheless, during the Revolutionary period some grand juries in the colonies "frustrated the efforts of royal officials to enforce unpopular laws." Beale, *supra*, § 1:3 at 14. In Massachusetts, for example, a grand jury refused to indict the Boston Gazette for libel against the governor. *Id.* In New York, multiple grand juries similarly refused to indict publisher John Peter Zenger, of the *New York Weekly Journal*, for libel against the governor of that colony. *Id.*; Schiappa, 43 Cath. U.L. Rev. at 329.

After this country had achieved independence, the tradition of using the grand jury for the bringing of criminal charges continued. Beale, *supra*, § 1:4 at 15-16. The former colonists' experiences with grand juries during the Revolution, as well as the English legal sources that the colonists had available to them, influenced the founders of the new state governments. *Id.*, § 1:4 at 16. Those sources, from Lord Coke to William Blackstone, "uniformly focused on the grand jury's role in protecting suspects against malicious and unfounded accusations." *Id.* It is true that the grand jury was not provided for in the United States Constitution when it was adopted, but by 1791, the Fifth Amendment had been ratified. *See id.*, § 1:4 at 19; Kadish, 24 Fla. St. U.L. Rev. at 11-12. That Amendment provides in part that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury[.]" U.S. Const. Amend. V. The United States Supreme Court has, since at least the nineteenth century, described the grand jury as an institution "designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation[.]" *Ex parte Bain*, 121 U.S. 1, 11 (1887) (quoting *In re Charge to Grand Jury*, 30 F. Cas. 992, 993 (C.C.D. Cal. 1872)).

**Secrecy**

Of course, lying at the heart of this dispute is not the general history of the grand jury, but the specific history and tradition of grand jury secrecy. It should be recognized that, as the grand jury evolved, the tradition of grand jury secrecy was born. *See* Kadish, 24 Fla. St. U.L. Rev. at 12-13. The oath that members of the grand jury were required to take did not include a vow of secrecy until the fourteenth century. *Id.* at 13. However, by the seventeenth century, the oath that was administered to grand jurors was similar to the oath in use in the 1940s, when the Federal Rules of Criminal Procedure were established. *Id.* at 13-14. One eminent legal scholar of the late seventeenth century, John Somers, explained that there were five reasons behind grand jury secrecy: to prevent criminals from fleeing; to determine whether witnesses were biased; to prevent judicial oversight; to enhance the truth-finding process; and to allow for the evidence to be fully developed. *Id.* at 14-15. Somers explained that, even though those benefits were for the King's interest, secrecy also had the effect of protecting the innocent accused. *Id.* at 15-16.

That notion—that confidentiality benefited those who were brought before the grand jury—soon took root in the United States. For example, in an early and influential charge to a grand jury in the District of California in 1872, Circuit Justice Stephen Johnson Field, who would later serve on the United States Supreme Court, said:

> "You are * * * to keep your own deliberations secret; you are not at liberty even to state that you have had a matter under consideration. Great injustice and injury might be done to the good name and standing of a citizen if it were known that there had ever been before you for deliberation the question of his guilt or innocence of a public offense." *In re Charge to Grand Jury*, 30 F. Cas. at 995.

In Rhode Island, albeit in a federal rather than a state court, the reasons for grand jury secrecy were expounded upon in a 1917 case decided by United States District Court Judge Arthur Lewis Brown, who served on that court for over thirty years, *United States v. Providence Tribune*

*Co.*, 241 F. 524 (1917).  In that case, a newspaper published by the Providence Tribune Company

had published an article divulging certain information that allegedly had come before a grand jury,

purportedly related to cocaine trafficking by prominent physicians in the state. *Providence Tribune*

*Co.*, 241 F. at 524-25.  In denying the publisher's motion to dismiss the contempt case brought

against it by the United States, Judge Brown explained the importance of grand jury secrecy:

> "Secrecy is essential to the proceedings of a grand jury for many reasons.  Publicity may defeat justice by warning offenders to escape, to destroy evidence, or to tamper with witnesses.  Even when indictments have been found and presented to the court, secrecy is extended until those indicted have been arrested.
>
> "* * * Even when [disclosure] does not lead to the flight of an offender, it may result in the disappearance of witnesses and of documentary proof, and thus in a failure of the grand jury to secure evidence sufficient for an indictment.
>
> "Secrecy is also required in order that the reputations of innocent persons may not suffer from the fact that their conduct is under investigation, or has been investigated, by a grand jury.
>
> "Secrecy is further required for the protection of witnesses who may go before the grand jury, and to encourage them to make full disclosure of their knowledge of subjects and persons under investigation, without fear of evil consequences to themselves.
>
> "Premature disclosures may thus injuriously affect and embarrass the attorneys for the United States in the duty of presenting matters to the grand jury, the grand jury itself in the duty of investigation, and court and grand jury alike in giving protection to witnesses and to other persons, by preventing scandals and rumors respecting matters which may or may not be under investigation.  Furthermore, such premature reports may go further and prejudice the mind of the public, thus affecting a trial which may follow the action of the grand jury." *Id.* at 526 (internal citations omitted).

### Modern Disclosure Practice in Rhode Island

Today, in this state, the grand jury is, for the most part, governed by Rule 6 of the Superior

Court Rules of Criminal Procedure.  Rule 6 contains provisions relating to the aspects of grand

jury procedure, from the number of grand jurors and their tenure to the making of objections. *See* Rule 6(a), (b), and (g). Of particular interest to us in this case is Rule 6(e), which relates to grand jury secrecy. Rule 6(e)(2) provides a general rule of secrecy that is followed by a number of exceptions, at Rule 6(e)(3), the effect of which are of significance to this appeal.

**B**

**Standing**

**i**

In advance of our addressing the Governor's arguments, we must consider whether the Governor has the requisite standing to seek the relief she requests. *See Carlson v. United States*, 837 F.3d 753, 757 (7th Cir. 2016). Although the Governor's standing to petition the Superior Court to release the 38 Studios grand jury material was not challenged in the Superior Court, standing is a prerequisite to a court's entertaining a claim or petition, and the issue may be raised by this Court *sua sponte. Robinson v. Mayo*, 849 A.2d 351, 353 n.2 (R.I. 2004) (acknowledging this Court's "authority to reach the issue of standing * * * *sua sponte*").

Standing is a component of justiciability that ensures that a complaining party has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness[,] which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult * * * questions[,]" exists. *Watson v. Fox*, 44 A.3d 130, 135 (R.I. 2012) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). To have standing, the party that believes itself to be aggrieved "must allege 'that the challenged action has caused him injury in fact, economic or otherwise.'" *Id.* (quoting *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 22, 317 A.2d 124, 128 (1974)). That injury-in-fact must be "concrete and particularized[.]" *Id.* at 135-36 (quoting *McKenna v. Williams*, 874 A.2d 217, 225 (R.I. 2005)). The party bringing suit, or in this case

petitioning the court, "must 'demonstrate that he has a stake in the outcome that distinguishes his claims from the claims of the public at large.'" *Id.* at 136 (quoting *Bowen v. Mollis*, 945 A.2d 314, 317 (R.I. 2008)). "[G]eneralized claims alleging purely public harm are an insufficient basis for sustaining a private lawsuit[,]" *id.*, and are also an insufficient basis on which to petition the court.

Arguments were not submitted to this Court on the issue of standing because, as acknowledged above, the issue was not raised in the Superior Court. Nevertheless, this Court ordered the parties to be prepared to address at oral argument whether the Governor does indeed have standing and whether, if this Court were to find that she does not, the lack of standing should be overlooked. At oral argument, the Governor argued that she has suffered a unique injury because, each year, when putting together the annual budget proposal for the state, she must allocate funds to pay off the remainder of the 38 Studios debt. She also argued that, as Governor and chairperson of the Rhode Island Commerce Corporation, her injury is unique.[8] At the same time, however, the Governor argues that the alleged injury is one shared by the general public; that is, the public's inability to secure full transparency with respect to the series of events culminating in 38 Studios' bankruptcy and the ensuing litigation. She also maintains that any member of the public has standing to petition the court to release court records.

On the other hand, the Attorney General argues that the Governor does not have standing and that the disclosure the Governor seeks—disclosure to the general public—is reflective of the Governor's lack of particularized harm. If the harm alleged by the Governor were particularized, the Attorney General argues, the Governor would be requesting that the materials sought be disclosed directly to the Governor alone to remedy the harm. Thus, the Attorney General contends,

---

[8] The Rhode Island Commerce Corporation is the successor organization to the EDC, of which the office of the Governor was also the chairperson.

because disclosure is sought for the public at large, the harm cannot be characterized as "particularized."

To support her claim that she has standing, the Governor draws this Court's attention to a 2016 case from the United States Court of Appeals for the Seventh Circuit, *Carlson*, cited *supra*. In that case, a three-judge panel of that court considered whether Carlson, "a journalist and historian with a special expertise in naval history" who petitioned the United States District Court for the Northern District of Illinois to unseal certain grand jury materials related to a 1942 *Chicago Tribune* article following the Battle of Midway that suggested that the United States had broken a Japanese code, while he was writing a book about that very article seventy years later, had standing. *Carlson*, 837 F.3d at 755, 756, 757. The court determined that Carlson did have standing, reasoning that grand jury materials are court records and, because the public has a general right to view such records, as a member of the public his injury-in-fact was "the denial of access to government documents that he ha[d] a right to seek." *Id.* at 758, 759.

Although we understand why the Governor believes that *Carlson* supports her position, we believe that the matter before us is readily distinguishable from *Carlson*, in particular with respect to the issue of standing. First, when a member of the general public brings a claim, that individual still needs to demonstrate a harm different from the harm shared by every other member of the public. *See Watson*, 44 A.3d at 136. While *Carlson*, which was decided by a divided three-judge panel, may seem to suggest otherwise when it comes to petitioning for access to grand jury records, *Carlson*, 837 F.3d at 759 ("That Carlson is a member of the public is sufficient for him to assert his 'general right to inspect and copy judicial records.'") (deletion and internal citation omitted), we disagree with that sweeping holding and note that the standing analysis in *Carlson* appears to have been colored by the fact that the petitioner was a historian writing a book about a long-ago

- 15 -

*Chicago Tribune* article that was the subject of the grand jury materials that he was seeking. *Carlson*, 837 F.3d at 756, 757. Thus, Carlson's injury was particularized.

In contrast, the Governor argued in the Superior Court that "Rhode Islanders should have full disclosure about [the] disastrous [38 Studios] deal. * * * [The Superior] Court should permit the release of all the grand jury material from the 38 Studios investigation so that our State can finally move past this unfortunate episode in our history." This is a clear allegation of a harm that is shared by the public at large, not one that is particular to the Governor in any way.

Second, in this case the Governor, unlike the petitioner in *Carlson*, is not seeking disclosure of the 38 Studios grand jury material as a member of the general public, but rather in her official capacity as the Governor of the State of Rhode Island. In that respect, and as has been recognized, the Governor argues that her injury is unique because she must allocate monies to pay off the remaining 38 Studios debt. Again, she also argues that her injury is unique given her position as Governor and chairperson of the successor organization to the EDC, which authorized the issuance of the 38 Studios bonds. Clearly, *Carlson* does not speak to such arguments. And, moreover, it is our opinion that, despite her responsibilities as Governor, which we certainly do not minimize, these arguments do not establish an injury-in-fact. Further, as the Attorney General points out, if the Governor's harm was particularized, that harm could be remedied by disclosure directly to the Governor's office. Instead, the Governor seeks public disclosure of all the grand jury material. Moreover, it is unclear to us how gaining access to the grand jury material would actually assist the Governor in the performance of her official duties.

**ii**

It is our opinion that the Governor does not meet the traditional requirements for standing that would enable her to petition for release of the materials she seeks. Nonetheless, it has long

been part of our jurisprudence that "on rare occasions this Court has overlooked the standing requirement to determine the merits of a case of substantial public interest." *Watson*, 44 A.3d at 138 (brackets omitted) (quoting *Burns v. Sundlun*, 617 A.2d 114, 116 (R.I. 1992)); *see Sennott v. Hawksley*, 103 R.I. 730, 732, 241 A.2d 286, 287 (1968) (explaining that "because there was a substantial public interest in the adoption or rejection of a new constitution," and due to other considerations, the Court would determine whether the constitutional convention exceeded its authority "without first resolving the standing question").

We cannot fail to recognize that the issue which has been framed is one that, as the Governor has so capably demonstrated, is of immense public interest. In her words, "[e]ven six years after the company closed its doors, the 38 Studios transaction and its consequences still makes front-page news." Moreover, we emphasize that this case does contain an element of the "concrete adverseness" that this Court relies upon to "sharpen[] the presentation of issues[.]" *Watson*, 44 A.3d at 135 (quoting *Baker*, 369 U.S. at 204). The case has been skillfully briefed and argued in the Superior Court and in this Court by some of the most highly regarded public attorneys in the state.

For these reasons, we shall overlook the absence of the traditional elements of standing and reach the merits of the controversy before us.

C

**Does the Superior Court Have the Inherent Authority to Release Grand Jury Materials Outside of Rule 6(e)?**

The Governor first argues that it was error for the Superior Court to read Rule 6(e) of the Superior Court Rules of Criminal Procedure as disallowing disclosure that does not have firm footing within the dictates of the rule. The Governor's argument is that the Superior Court is cloaked with inherent supervisory authority over the grand jury and, as had been the case with

some federal decisions, that authority includes the discretion to disclose grand jury material where there exists "special or exceptional circumstances."[9]  Moreover, she argues that the permitted disclosures in Rule 6(e) are just that, permissive and nonexclusive, and that Rule 6(e) does not preclude disclosures by the Superior Court in other circumstances.  The Governor further asserts that the general rule of secrecy contained in Rule 6(e) is limited to specific persons and does not apply to the Superior Court itself.

In contrast, the Attorney General maintains that the disclosures permitted by Rule 6(e) are all-inclusive.  Rule 6(e), the Attorney General argues, "requires grand jury secrecy be maintained 'except as otherwise provided for in these rules[.]'" (Quoting Rule 6(e)(2).)  According to the Attorney General, because the Governor does not seek disclosure pursuant to the rigid requirements of Rule 6(e), the Governor's request must fail.

Whether the Superior Court has inherent authority to release grand jury materials outside of the permitted disclosures set forth in Rule 6(e) is a question of law.  As such, our standard of review is *de novo*. *Dellagrotta v. Dellagrotta*, 873 A.2d 101, 109 (R.I. 2005).

We begin our analysis with the text of that rule.  In its current form, Rule 6(e)(2) provides the "General Rule of Secrecy."  It states:

> "A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the State, or any person to whom disclosure is made under subdivision (e)(3)(A)(ii) shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.  A knowing violation of Rule 6 may be punished as a contempt of court." Super. R. Crim. P. 6(e)(2).

The very next provision of Rule 6(e) permits certain "[d]isclosure otherwise prohibited by this rule" that "may be made" in a number of circumstances. Rule 6(e)(3)(A) and (C).  Rule

---

[9] The Governor forthrightly states that she "is not seeking disclosure pursuant to Rule 6(e)."

6(e)(3)(A)(i) and (ii) permit disclosure to "[a]n attorney for the State for use in the performance of such attorney's duty" and to "government personnel * * * deemed necessary by an attorney for the State to assist an attorney for the State in the performance of such attorney's duty to enforce criminal law." Rule 6(e)(3)(C) permits disclosure in four other circumstances, three of which require that the court itself must pass on the propriety of the disclosure:

> "(i) When so directed by a court preliminarily to or in connection with a judicial proceeding; (ii) When permitted by a court at the request of the defendant * * *; (iii) When the disclosure is made by an attorney for the State to another grand jury; or (iv) When permitted by a court at the request of an attorney for the State * * * to an appropriate official of the federal government for the purpose of enforcing such [federal criminal] law."

Rule 6(e), as we have said in the past, "codifies the traditional rule of grand jury secrecy[.]" *In re Doe*, 717 A.2d at 1134. We have not yet, however, had occasion to determine just how much control Rule 6 exercises over the Superior Court's common-law authority over the grand jury. Both the Governor and the Attorney General make strong arguments. The Governor rightly points out that Rule 6(e)(2), the general secrecy provision, does not mention the Superior Court itself as an entity held to secrecy. Rather, the rule specifically lists "[a] grand juror, an interpreter, a stenographer, an operator of a recording device, a typist * * *, an attorney for the State, or any person to whom disclosure is made [pursuant to a particular provision permitting disclosure]" as those entities bound to secrecy. Super. R. Crim. P. 6(e)(2). On the other hand, the Attorney General also rightly points out that Rule 6(e)(2) specifically holds to secrecy those employees of the Superior Court, in his words, "who would have direct knowledge or possession of grand jury materials" and, he adds, that it is sensible for the Superior Court itself not to be enumerated in the rule because the Superior Court itself does not actually come into contact with grand jury material.

- 19 -

With respect to the Governor's assertion that Rule 6(e) is permissive, the stripes of this argument bleed into the question of whether the Superior Court has inherent authority to release grand jury materials outside of the exceptions to grand jury secrecy listed above. That is, if disclosure is a matter of total discretion within the Superior Court's inherent authority, then the rule is in fact permissive, or demonstrative, of that authority. On the other hand, if such inherent authority does not exist, the rule expresses the full extent of the Superior Court's authority with respect to disclosure. We therefore move directly to whether the Superior Court has such inherent authority.

The Governor is correct that we have in the past endorsed the principle "that the grand jury is an arm of the Superior Court[,]" and also that "[i]t is not under the control of the Attorney General." *In re Young*, 755 A.2d 842, 843 (R.I. 2000) (mem.). The Governor also argues that historically included in the inherent authority of courts over the grand jury is the discretion to disclose grand jury materials that would normally be secret; she points out that Rhode Island courts have recognized that "[t]he granting of access to Grand Jury materials is a matter within the discretion of the Superior Court." *In re Station Fire Grand Jury*, 2006 R.I. Super. LEXIS 193, at *4 (R.I. Super. Ct. Dec. 21, 2006). Indeed, this Court has determined that whether to disclose grand jury materials is, *in appropriate instances*, a matter within the discretion of the Superior Court. *See State v. Ouimette*, 110 R.I. 747, 764, 298 A.2d 124, 135 (1972).

In *Ouimette*, a case tried in the Superior Court two years before the adoption of the Superior Court Rules of Criminal Procedure and decided by this Court just months after their adoption, we considered whether a justice of the Superior Court erred in denying the requests of two defendants to inspect grand jury minutes in connection with their defenses at their trials for murder. *Ouimette*, 110 R.I. at 763-64, 298 A.2d at 134-35. While we ultimately concluded that the Superior Court

did not commit error because the defendants failed to demonstrate a particularized need for the information requested, we indicated that we were making our determination through the prism of an abuse of discretion standard. *Id.* at 764, 298 A.2d at 135. That case, however, cannot stand for the proposition that our Superior Court has, or always has had, wide-reaching discretion when it comes to disclosure of grand jury materials. The defendants in *Ouimette* were seeking to make use of grand jury materials in connection with their defenses to the capital crimes with which they had been charged—a circumstance under which Rule 6(e) would not prevent disclosure. *See* Rule 6(e)(3)(C)(i) (permitting disclosure "[w]hen so directed by a court preliminarily to or in connection with a judicial proceeding").[10]

Similarly, *In re Station Fire Grand Jury*, the case which the Governor quotes for the proposition that Rhode Island courts have the discretion to disclose grand jury material, specifically addressed whether disclosure was appropriate in connection with ongoing litigation, pursuant to Rule 6(e)(3)(C)(i). *In re Station Fire Grand Jury*, 2006 R.I. Super. LEXIS 193, at *3, *4, *5-6, *21. These cases, therefore, provide little guidance as we grapple with the question before us.[11]

---

[10] It is noteworthy that today, Rule 16 of the Superior Court Rules of Criminal Procedure, the reciprocal discovery rule, independently provides for disclosure of certain grand jury materials in instances such as those in *State v. Ouimette*, 110 R.I. 747, 298 A.2d 124 (1972).

[11] The United States Supreme Court cases on which the Governor relies for the general proposition that historically the courts had discretion to disclose grand jury materials that would normally be secret similarly provide us scant guidance as we consider the Governor's disclosure request. Both cases cited by the Governor for that proposition include allusions to the discretion of the trial court, but in very different circumstances than the case presently before us. *See Pittsburgh Plate Glass Company v. United States*, 360 U.S. 395, 399, 401 (1959) (stating that "Rule 6(e) is but declaratory of" the principle that disclosure of grand jury material is "committed to the discretion of the trial judge" in a case where defendants argued they had an absolute right to inspect certain grand jury minutes); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 233 (1940) (stating that the "use of grand jury testimony for the purpose of refreshing the recollection of a witness rests in the sound discretion of the trial judge"). Interestingly, in *Pittsburgh Plate Glass Company*, the United States

As the Attorney General points out, this Court, in a case that was decided after the adoption of the Superior Court Rules of Criminal Procedure, endorsed the concept that where a "disclosure request would pierce the veil of secrecy shielding the matters which occurred before the grand jury, the [request] must be denied unless an exception can be shown." *In re Young*, 755 A.2d at 847. This language strongly indicates that only in those cases where an enumerated Rule 6(e) exception is applicable should the Superior Court consider whether disclosure is appropriate. However, *In re Young* dealt with the requests of the City of Providence and the estate of police Sergeant Cornel Young, Jr., to access materials from the grand jury that investigated the shooting and death of Sergeant Young by two fellow Providence police officers. *Id.* at 845. Both the city and the estate of Sergeant Young sought the information because the Sergeant's estate had filed a notice of claim with the Providence City Council seeking significant damages and equitable relief, which carried the specter of a potential civil lawsuit. *Id.* at 845, 848. As was made clear in that case, the issue was whether disclosure was appropriate under Rule 6(e)(3)(C)(i). *Id.* at 846-48. As such, *In re Young* also provides little insight into disclosure requests that, like the Governor's request, lie outside the reach of Rule 6.[12]

---

Supreme Court also stated: "[A]ny disclosure of grand jury minutes is covered by Fed.Rules Crim. Proc. 6(e)[.]" *Pittsburgh Plate Glass Company*, 360 U.S. at 398.

[12] It is noteworthy that, as the Attorney General also points out, we have said that: "In construing Rule 6(e), courts begin with the 'fundamental policy of grand jury secrecy.'" *In re Doe*, 717 A.2d 1129, 1134 (R.I. 1998) (quoting *In re Grand Jury Investigation*, 642 F.2d 1184, 1190 (9th Cir. 1981)). While true, that statement does not provide an answer to the question of whether the disclosures a court is permitted to make under Rule 6(e) are exhaustive or permissive. Significantly, the language of *In re Doe* is used by both the Governor and the Attorney General to support their respective positions. That is because in *In re Doe*, we also indicated that "the secrecy extended to grand jury proceedings is not absolute[,]" *id.*, and that "[t]here is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers." *Id.* (quoting *Senate of the Commonwealth of Puerto Rico v. United States Department of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987)). In any event, *In re Doe* is also of little guidance because it did not concern the question of under which circumstances a court can disclose grand jury material. Rather, it concerned whether notice to a patient that a subpoena had been issued by the grand jury for his

- 22 -

The Governor, recognizing that the question before us is one of first impression for this Court, directs us to federal caselaw. She argues that "the great weight of federal cases" supports her contention that "the Superior Court has the inherent authority to disclose grand jury material outside the confines of Rule 6(e)."

Indeed, it is true that a number of federal appellate courts have concluded that the federal district courts have the inherent authority to disclose grand jury materials, even if those disclosures fall outside of the exceptions set out in Rule 6(e) of the Federal Rules of Criminal Procedure. *See Carlson*, 837 F.3d at 767 ("The district courts retain certain inherent powers * * * . One such power relates to their supervision of the disclosure of grand-jury materials. * * * Rule 6(e)(3)(E) does not displace that inherent power."); *United States v. Aisenberg*, 358 F.3d 1327, 1347 (11th Cir. 2004) ("Although Rule 6(e)(3) enumerates the exceptions to the traditional rule of grand jury secrecy, the Supreme Court and this Court have recognized that the district courts have inherent power beyond the literal wording of Rule 6(e)(3) to disclose grand jury material and that Rule 6(e)(3) is but declaratory of that authority."); *In re Petition of Craig*, 131 F.3d 99, 102 (2d Cir. 1997) (explaining that under federal Rule 6(e)(3), "district courts, as part of their supervisory authority over the grand juries that they have empaneled, are explicitly given the discretion to determine whether, if one or more of the listed exceptions to grand jury secrecy apply, disclosure of records is appropriate"; and also explaining that, because "Rule 6(e) * * * reflects rather than creates the relationship between federal courts and grand juries[,]" "there are certain 'special

medical records, a disclosure that was required by the Confidentiality of Health Care Communications and Information Act, violated Rule 6(e). *Id.* at 1130. We were not satisfied that the subpoena constituted "a matter occurring before the grand jury." *Id.* at 1135 (brackets omitted) (quoting Super. R. Crim. P. 6(e)).

circumstances' in which release of grand jury records is appropriate even outside of the boundaries of the rule").

However, the point of view that Rule 6(e)(3) can be circumvented is not unanimous. Last year, a three-judge panel of the United States Court of Appeals for the District of Columbia Circuit ruled that federal courts lack the "inherent authority" to authorize the disclosure of grand jury materials in circumstances not covered by the explicit exceptions in federal Rule 6(e). *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019), *cert. denied*, __ S. Ct. __ (Jan. 21, 2020). *McKeever* rejected the view articulated in the federal cases relied upon by the Governor, holding instead that "the district court has no [inherent] authority" "to disclose what we assume are historically significant grand jury matters." *Id.*

After reviewing the competing and conflicting authority, and after carefully considering the thoughtful arguments of the opposing constitutional officers, we are confronted with the ultimate question: Does our Superior Court have the authority to disclose grand jury materials if that disclosure is not authorized by Rule 6(e)? Importantly, as we have in the past recognized, "the Superior Court is statutory in origin and derives its powers from statutes duly enacted by the Legislature." *State v. Briggs*, 934 A.2d 811, 815 (R.I. 2007) (quoting *State v. DiStefano*, 764 A.2d 1156, 1167-68 (R.I. 2000)). That is to say, the Superior Court does not *generally* have the right to exercise "inherent authority," and the Superior Court is not permitted to act outside of the mandates of a statute or, as in this case, court rule. Put another way, our general rule is: That which is not proscribed by statute or rule is forbidden—not that anything that is not expressly forbidden is permissible. *See Drago Custom Interiors, LLC v. Carlisle Building Systems, Inc.*, 57 A.3d 668, 673-74 n.5 (R.I. 2012) (rejecting the notion that the Superior Court has "inherent authority to remand an arbitration award"); *Briggs*, 934 A.2d at 815, 816 (explaining that because "the

- 24 -

Legislature * * * has established an explicit statutory scheme for maintaining, handling, expunging, and sealing Bureau of Criminal Identification * * * records[,]" the Superior Court does not have authority to expunge records outside of that scheme); *State v. Dearmas*, 841 A.2d 659, 661-62 (R.I. 2004) (explaining that, where the General Assembly has created a statutory scheme for the issuance of search warrants, "the Superior Court does not possess any inherent authority" to go outside of that scheme to accomplish a seizure); *see also State v. Manocchio*, 743 A.2d 555, 557 (R.I. 2000) ("[D]espite the inherent supervisory power provided to Superior Court justices to govern proceedings before them and to vindicate their authority by appropriate sanctions, such supervisory power is limited by rules that are constitutionally authorized.").[13]   Therefore, we are constrained to answer the question in the negative: There is no inherent authority in the Superior Court to disclose grand jury materials beyond that which is permitted by the Superior Court Rules of Criminal Procedure.

---

[13] It is true that this Court has recognized certain inherent powers of the Superior Court, in particular those powers necessary for the Superior Court to vindicate its own authority. *See Lett v. Providence Journal Company*, 798 A.2d 355, 365 (R.I. 2002) ("[T]rial courts possess the inherent authority to protect their integrity by sanctioning any fraudulent conduct by litigants that is directed toward the court itself or its processes, as informed by the procedures and sanctions available to the court and to the parties under [the Superior Court Rules of Civil Procedure]."); *State v. DiPrete*, 710 A.2d 1266, 1275 (R.I. 1998) ("We concur with the general proposition that justices of the Superior Court have inherent power to govern proceedings before them and to vindicate their authority by appropriate sanctions including the sanction of contempt."); *Mello v. Superior Court*, 117 R.I. 578, 583-84, 370 A.2d 1262, 1265 (1977) (explaining that the Superior Court has inherent authority to revoke a defendant's bail even though the Rules of Criminal Procedure provide other sanctions for breach of a condition and the General Assembly has not granted the Superior Court such authority, because "a court with jurisdiction over a criminal case has the power to enforce its orders as to bail just as it has control over other orders"). Another example of this kind of power is that of the trial justice "to sequester witnesses during trial testimony for the purpose of preventing that witness from shaping his or her testimony to conform to that of other witnesses." *State v. Perez*, 882 A.2d 574, 583 (R.I. 2005). Other inherent powers of the Superior Court do exist; however, none of those are at all similar to the asserted inherent power here. *See State v. Lead Industries Association, Inc.*, 951 A.2d 428, 479 (R.I. 2008) ("Courts have the inherent authority to review attorney contingent fee contracts in order to prevent unreasonableness.").

In reaching this conclusion, we harken back to our long-standing principles expressed in *In re Opinion to the Governor*, 62 R.I. 200, 4 A.2d 487 (1939), in which we said that: "One of [the grand jury's] main purposes was to protect the rights of the individual citizen against possible oppression by the crown or its agencies in the prosecution of crimes[,]" *In re Opinion to the Governor*, 62 R.I. at 203, 4 A.2d at 488; and in *In re Buxton*, 111 R.I. 480, 304 A.2d 350 (1973), in which we endorsed the principle that "the grand jury was a shield which would protect an accused from governmental oppression[.]" *In re Buxton*, 111 R.I. at 482, 304 A.2d at 352. We are of the opinion that, as the history reflects, grand jury secrecy plays an integral part not only in the effective prosecution of crimes, but also in the protection of those upon whom the grand jury casts its considerable inquisitorial powers, which in turn is a protection potentially afforded to every member of the public. We decline to hold that the Superior Court has the authority to act as the Governor advocates. We affirm the judgment of the Superior Court.

**D**

**Did the Governor Present Special or Exceptional Circumstances?**

In light of our conclusion that the Superior Court is not garbed with the inherent authority to disclose grand jury materials outside of Rule 6(e)(3), it is not necessary for us to consider the Governor's arguments that the Superior Court erred in its alternative analyses. However, in view of the heightened public nature of the issues implicated by this case, and considering that the matter concerns a legal battle between two constitutional officers, we think it appropriate that we highlight that, even had we held that the Superior Court did have inherent authority to act as the Governor advocates, we would have had no hesitation in determining that it would have been well within the Presiding Justice's discretion to deny the Governor's petition. That is so because we are confident that even those courts that allow the release of grand jury material under special or

exceptional circumstances would not have granted the Governor's petition. In fact, the cases the Governor urges upon us to support her argument, in which petitioners uninvolved in the underlying proceedings sought public disclosure of grand jury materials, differ starkly from this case.

In the vast majority of the cases offered by the Governor to support her argument, in which a court has publicly released grand jury material under special or exceptional circumstances, the subject of the grand jury was of unquestionably intense national historical interest; a significant amount of time—decades—had passed since the grand jury proceedings had closed; the disclosures were sought by historians; and the courts released but a limited amount of information. *See Carlson*, 837 F.3d at 756-57 (affirming disclosure of transcripts of witness testimony from grand jury that investigated newspaper's publication of a 1942 article after the critical Battle of Midway on petition from historian who was writing a book about the article "more than 70 years later"); *In re Pitch*, 275 F. Supp. 3d 1373, 1375-76, 1379, 1383 (M.D. Ga. 2017) (ordering the disclosure of "the 71-year-old transcripts" from grand jury that investigated the 1946 Moore's Ford lynching on petition of historian);[14] *In re Petition of National Security Archive*, 104 F. Supp. 3d 625, 626-27 (S.D.N.Y. 2015) (ordering disclosure of testimony transcript of two witnesses who testified before grand jury that indicted Julius and Ethel Rosenberg in 1950, for conspiracy to commit espionage by handing information related to the atomic bomb to Soviet agents, on petition of nonprofit organization, various historical associations, and journalist);[15] *In re Petition of Kutler*,

---

[14] *In re Pitch*, 275 F. Supp. 3d 1373 (M.D. Ga. 2017), was heard on appeal by the United States Court of Appeals for the Eleventh Circuit. *Pitch v. United States*, 915 F.3d 704 (11th Cir. 2019). That court, after affirming the decision of the district court, *id.* at 707, granted rehearing en banc and vacated the panel's affirmance. *See Pitch v. United States*, 925 F.3d 1224 (11th Cir. 2019). The full panel of the court has yet to issue an opinion on rehearing.

[15] It is worthy of mention that other witness testimony from the same grand jury proceedings had previously been released by the same court; however, an extensive analysis was not provided. *See In re National Security Archive*, No. 08 Civ. 6599 (AKH), 2008 WL 8985358, at *1 (S.D.N.Y. Aug. 26, 2008).

800 F. Supp. 2d 42, 43, 49, 50 (D.D.C. 2011), *abrogated by McKeever*, cited *supra* (ordering disclosure of President Richard Nixon's 1975 grand jury testimony and associated materials thirty-six years after he testified, and seventeen years after his death, on petition of historian, various historical associations, and the Society of American Archivists); *In re American Historical Association*, 49 F. Supp. 2d 274, 277-78, 292, 297 (S.D.N.Y. 1999) (ordering the disclosure of certain grand jury transcripts from the two grand juries convened from 1947 to 1950 that investigated Alger Hiss for "historical reasons fifty years after the proceedings ended[,]" on petition of various historical associations).[16]

In our opinion, the Governor's case is not analogous in any way to any of those cases.[17] First, the Governor seeks disclosure, not of a limited nature, but, as the Presiding Justice put it, of

---

[16] We also observe that certain grand jury materials related to the 1998 investigation conducted by Independent Counsel Kenneth W. Starr into President William Clinton's relationship with Monica Lewinsky were ordered to be released by the United States District Court for the District of Columbia on petition of CNN and one of its journalists. *In re Unseal Dockets*, 308 F. Supp. 3d 314, 317 (D.D.C. 2018), *abrogated by McKeever v. Barr*, 920 F.3d 842 (D.C. Cir. 2019), *cert. denied*, __ S. Ct. __ (Jan. 21, 2020). Although the proceedings in that case "took place two decades ago[,]" *id.* at 327, which is not as substantial an amount of time as in the cases listed above, and no historians were involved, public interest on a national scale in that matter was beyond question. However, even in that case, the court did not order a wholesale release of all information. *Id.* at 319, 328, 329, 331, 333-34. Moreover, as has been set forth *supra*, this decision has been abrogated by virtue of a ruling by the D.C. Circuit that the district courts do not have inherent authority to disclose grand jury material outside of Rule 6(e). *McKeever*, 920 F.3d at 843.

[17] In a very recent decision, *Lepore v. United States*, No. 18-mc-91539-ADB, slip op. (D. Mass. Feb. 4, 2020), a judge of the United States District Court for the District of Massachusetts granted in part the petition of a professor from Harvard University to release grand jury records from two 1971 federal grand juries that investigated the famous disclosure of the so-called "Pentagon Papers." *Lepore*, slip op. at 1-2. We find it noteworthy that that decision relates to a petition which presented circumstances that are significantly different from the petition before us. The petitioner in *Lepore* sought disclosure of grand jury information from an event that was undoubtedly of immense national historical interest. Moreover, the grand juries in that case convened in 1971, almost fifty years ago. *Id.* And, importantly, the court refused to grant wholesale disclosure, stating: "The Court will not * * * grant Lepore unfettered access to the materials she seeks." *Id.* at 11. For example, the court explained that it would release transcripts and exhibits related to witnesses, still living, who had consented to the release and to deceased witnesses, but that the government would have an opportunity to propose redactions and withholdings. *Id.* at 12, 15.

"all materials or documents presented to the grand jury, including transcripts, recordings, exhibits, and all other documents."  Second, no historians, journalists, or historical or educational institutions seeking to advance a historical record are involved in the case.  Third, and extremely significantly, the grand jury completed its work only five years ago.  And, fourth, in light of the relatively brief period of time that has passed since the events at issue occurred, the public interest, while intense, is not yet historical in nature, nor has it been tested by the passage of time. *See In re Petition of Craig*, 131 F.3d at 107 (explaining that sustained interest over time can demonstrate the substantiality of the interest).

We conclude that, had we determined that it was necessary to address whether the Governor presented special or exceptional circumstances, the timing of the Governor's petition alone would have been all but fatal to her request.  As has been explained by the Second Circuit Court of Appeals in *In re Petition of Craig*, "[t]he timing of [a] request remains one of the most crucial elements" for at least three reasons. *In re Petition of Craig*, 131 F.3d at 107.  "First, if historical interest in a specific case has persisted over a number of years, that serves as an important indication that the public's interest in release of the information is substantial." *Id.*  "Second, the passage of time erodes many of the justifications for continued secrecy." *Id.*  And "[t]hird, the passage of time eventually, and inevitably, brings about the death of the principal parties involved

---

Finally, the court said that it would consider a stay in the event that the government sought review by a higher court. *Id.* at 15.

While the decision, which determined that the federal courts have "inherent authority to disclose grand jury records[,]" *Lepore*, slip op. at 8, is clearly at odds with our holding that our Superior Court does not have inherent authority to release grand jury materials outside of our Rule 6(e), we think it important to point out that, even that court refused wholesale disclosure, "only reluctantly allow[ed] the release[,]" recognized that "[g]rand jury proceedings have traditionally been kept secret and with good reason[,]" was "loath to erode this presumption of secrecy[,] and [was] wary of the risk of unintended consequences." *Id.* at 14-15.  The court also highlighted that it was "concerned that any 'historical' exception could be expanded beyond the very limited exception the Court recognize[d][.]" *Id.* at 15.

in the investigations, as well as that of their immediate families. And the continued existence and vulnerability of such parties is, of itself, a factor that a court should consider." *Id.*[18]

It cannot be said that time has eroded the justification for secrecy because, in the context of existing jurisprudence, a substantial amount of time has not passed. The grand jury adjourned in 2015, and the Governor petitioned the Superior Court for release of all grand jury materials less than two years later, in 2017. As the Attorney General points out, the statute of limitations to bring criminal charges for potential conduct that might be related to 38 Studios has not yet expired. And, as the Presiding Justice stated in her analysis, given that the grand jury investigation at issue concluded in 2015, it is "highly likely that the principals of the grand jury proceedings, along with witnesses, would still be alive[.]" Individuals who may have been under investigation but were not indicted do not deserve to have their names placed in the crucible of public opinion.[19] Nor

---

[18] In *In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997), the court provided a number of considerations as potentially relevant in determining whether special circumstances exist. Those considerations are:

> "(i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material— either permissibly or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question." *In re Petition of Craig*, 131 F.3d at 106.

While we do not discuss each consideration in the body of this text, we are convinced that virtually none of these factors would weigh in favor of granting the Governor's petition.

[19] Although the Governor has argued that the public likely already knows the identity of those that were under investigation by the grand jury because of the 38 Studios civil litigation and wide media coverage, we think the operative word in that argument is "likely." Moreover, the Governor's argument that there is no need to protect exonerated targets because the Investigation Results stated

should witnesses, who relied on advice and precedent that their testimony would remain secret, in the absence of a public trial, be subjected to their accounts of events being displayed on the front pages of newspapers or broadcast over the airwaves.

Again, had we reached the question of whether the Presiding Justice abused her discretion in denying the Governor's petition, we would have unhesitatingly held that she did not.

### III

### Conclusion

For many people in this state, particularly those who are currently holding public office, the 38 Studios situation and the company's bankruptcy, occurring as it did just as the entire country was clawing its way out of the Great Recession, still stings. We certainly understand those feelings. However, after careful consideration of the issues ably briefed and argued by the parties, the judgment of the Superior Court is affirmed. The papers in this case shall be returned to the Superior Court.

---

that there was insufficient evidence to offer a criminal charge for consideration by the grand jury would similarly be unpersuasive.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | In re 38 Studios Grand Jury. |
| **Case Number** | No. 2017-301-Appeal. (PM 17-701) |
| **Date Opinion Filed** | February 19, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Presiding Justice Alice B. Gibney |
| **Attorney(s) on Appeal** | For the Governor: Claire J. Richards, Esq. Adam J. Sholes, Esq. |
| | For the Attorney General: Michael W. Field, Esq. Susan Urso, Esq. Rebecca Tedford Partington, Esq. Kate C. Brody, Esq. |